Gary KNOP, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, T. Jon Spytma, Robert Shipp, Butch Davis, Ron Mixon, and Kerwin Cook, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Perry M. JOHNSON, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik, and Jack Bergman, Defendants.

No. G84–651.

United States District Court, W.D. Michigan, S.D.

May 5, 1988.

National Prison Project of the American Civil Liberties Union Foundation, Washington, D.C. by Elizabeth Alexander, Adjoa Aiyetoro, for plaintiffs.

Frank J. Kelley, Atty. Gen., State of Mich., Lansing, Mich. by Thomas C. Nelson, Brian MacKenzie, for defendants.

## OPINION

ENSLEN, District Judge.

Upon the completion of a lengthy bench trial on the liability issues in this matter, the Court directed defendants to submit proposed plans to remedy the constitutional violations found to exist at the subject institutions. *See, Knop v. Johnson,* 667 F.Supp. 467 (W.D.Mich.1987). Defendants' submitted their proposed plans on October 13, 1987. Plaintiffs submitted their comments on those plans, and their own recommendations on November 17, 1987. On March 1, 1988 the Court began a four day hearing on the entry of the remedial plans proposed by both parties. The order which follows this Opinion is the product of the Court's consideration of the testimony received at that hearing and the plans submitted by both parties.

In devising a remedial order to redress the numerous constitutional violations found to exist in this Court's Opinion and Order of August 10, 1987, the Court was not unmindful of the Sixth Circuit's admonition that a district court must "impose the least intrusive remedy available" to remedy unconstitutional conditions in state prisons. *Kendrick v. Bland,* 740 F.2d 432, 438 (6th Cir.1984). In my order, I have attempted to abide by the restraints imposed by *Kendrick,* and by the precepts of comity and federalism so often noted in similar cases. *See, State of Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 695–96, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). I have also attempted to utilize the "healthy sense of realism" noted in *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), by deferring, wherever possible, to the judgment of prison administrators, and

by retaining, to the largest degree possible, their discretion to control matters of internal discipline. *See also, Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979); *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Ruiz v. Estelle,* 679 F.2d 1115, 1145–1146 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

■ Comity, federalism and appropriate deference to prison administrators notwithstanding, it remains this Court's duty to devise an order which will promptly and effectively remedy the constitutional inadequacies noted in my opinion of August 10, 1987. "It is fundamental that the federal forum, as the ultimate guardian of constitutional rights, possesses the authority to implement whatever remedy is necessary to rectify constitutionally infirm practices, policies or conduct." *Kendrick,* 740 F.2d at 437. *See also, Hutto v. Finney,* 437 U.S. 678, 688 note 9, 98 S.Ct. 2565, 2572 note 9, 57 L.Ed.2d 522 (1979) ("Once invoked, 'the scope of a district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies'") (*quoting, Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971)).

■ 1. *Toilets at RCF.* Defendants originally requested that they be given three years to construct the necessary toilet facilities at this institution. George Walter, the department's Physical Plant Division Manager, testified in his deposition, however, that the project could be completed within 26 months, if the defendants attended to it on an expedited basis. Walters Deposition of February 24, 1988 at 13–15 and Exhibit 1. He further testified that the project could take between five and six years to complete, if it were allowed to filter through the "normal process" of obtaining funding, accepting bids and construction.

The Court chose to adopt the earlier completion date as requested by plaintiffs because of the clear need to remedy this unconstitutional condition as quickly as possible. Prisoners will continue to be incarcerated in locked cells without sanitary toilet facilities until the construction mandated by this Order is completed. The unconstitutional condition will continue to exist, and to impact directly upon those prisoners until that time. Further, the Court is well aware from its experience in implementing the consent decree in *United States v. State of Michigan,* No. G84–63 (W.D.Mich.), that construction delays are inevitable, and often unavoidable, and that the only way to insure reasonably prompt completion of such a project is to impose a strict deadline upon it. Obviously, as the order itself indicates, the Court is willing to accept a certain amount of delay in the completion of this project, but the Court can see no reason to build that delay into its order at the outset. Thus, I have chosen to impose a construction deadline which will require defendants to attend to this matter promptly, and which will allow the Court and the parties to take delays into consideration as they occur.

2. *Legal Mail.* This aspect of the order is essentially consistent with defendants' proposed plan, except that it remedies the most serious omission of that plan by providing a means for notifying current prisoners of the change in the legal mail policy. I have given defendants discretion to adopt an appropriate method for notifying these prisoners of the new policy. The Court notes that, notwithstanding the requirement that defendants inform this Court of their plan to notify current prisoners of the change, defendants are required to begin informing new prisoners of the policy immediately. The Court notes further that it would be prepared to accept a notice plan for current prisoners which is similar to the plan adopted by the parties to notify class members of the impending dismissal of certain claims in this action. In other words, the Court would accept a notice plan which provides for posting of the new regulation on bulletin boards in general population housing units and for individual notice to prisoners in segregation units or to prisoners who would not otherwise have access to those bulletin boards.

■ 3. *Racial Slurs.* This portion of the order presented the most difficult issue for the Court to resolve. The Court heard a great deal of testimony both at trial and at the remedial hearing regarding the defendants' employee discipline policy, its collective bargaining agreement, the Civil Service Regulations and the need for flexibility and discretion in resolving personnel matters. In my opinion of August 10, 1987, I found that the defendants had violated the Constitution by intentionally subjecting black inmates to a pattern of racial harassment, in the form of racially derogatory conduct by corrections officers. Opinion at 76. I further found that, while the defendants' official employment policies prohibited racial discrimination by staff, the defendants rarely, if ever, disciplined staff for engaging in such conduct. In addition, I found that the defendants' requirement that allegations of racially derogatory conduct be substantiated by other staff members effectively prevented such discipline from occurring. *See,* Opinion at 77–79; 3–17–87 Tr. at 142–43; 3–18–87 Tr. at 34–35; 3–19–87 Tr. at 13; Defendants' Exhibits 100, 1091 110 and 319a. I thus concluded that the defendants, acting in their official capacities, had "consciously, voluntarily and with reckless indifference to the rights of black inmates ... failed to implement policies that would prevent this situation from occurring and [that the defendants] affirmatively encourage its continuation." Opinion at 79.

The testimony by defense witnesses at the remedial hearing essentially mirrored the testimony considered by the Court in its August 10, 1987 Opinion. Defendants' proposed remedial plan would only continue the ineffective policies of staff training and counselling currently in place. I heard no testimony at the remedial hearing which convinced me that the defendants' current policies would be any more effective at eliminating the use of racial slurs by corrections officers now than those policies have been in the past. Moreover, defendants' proposed plans contained no provision for remedying the most glaring deficiency in the current policies—the requirement that inmate allegations of racially deroga-

tory staff conduct be corroborated by other staff before disciplinary action is considered.

In short, I found that a constitutionally infirm policy existed, even in light of the anti-discrimination and employee discipline policies adopted by the defendants, because the plaintiffs clearly showed at trial that corrections officers were rarely, if ever, disciplined for engaging in racially derogatory conduct. The defendants' proposed plan, although it would achieve the somewhat salutary goal of retaining departmental control over personnel policy, does nothing to alleviate that constitutional deficiency. It thus appears to the Court that the defendants have had an opportunity to remedy unconstitutional policies without federal interference and have failed to do so. A more intrusive remedial order is not only appropriate, it is constitutionally required. *See, Kendrick,* 740 F.2d at 439 ("In the event that the state fails to avail itself of the deferential opportunity to correct its constitutional defects with minimal federal intrusion, the federal court may implement a more intrusive remedy"). *See also, Hutto v. Finney,* 437 U.S. 678, 688 note 9, 98 S.Ct. 2565, 2572 note 9, 57 L.Ed. 2d 522 (1979); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971).

The Court was persuaded by the testimony of plaintiffs' expert witness, Mr. McManus, that the only way to eliminate racially derogatory conduct by staff is to send staff a clear message that such conduct simply will not be tolerated by the prison administration. The most effective way to send that message is to impose and enforce harsh penalties for such unacceptable behavior. Defendants' proposed policies of training and counselling are targeted toward changing the corrections officers' hearts and minds rather than toward changing their conduct. The Court would be the first to agree that changing bigotted attitudes is the ultimate goal of any policy to eliminate discriminatory conduct, but the fact remains that staff conduct and not staff "attitudes" created the constitutional

violation, and it is the conduct which must change in order to remedy that violation. If changes in attitudes follow, so much the better, but the Court will not adopt an order which ignores very real, current behavior by staff in the hope that at some unforeseeable time in the future bigotted staff members will either quit their jobs or change their attitudes. As Mr. McManus testified, this is essentially a management problem and, as I found in my August 10 Opinion, the prison administrators have demonstrated their unwillingness or inability to deal with this problem in a realistic, firm manner. The Court has no alternative, given this situation, but to usurp some measure of the defendants' discretion as administrators in order to insure that the constitutional violation is remedied.

Thus, the Court has taken the somewhat drastic step of mandating particular disciplinary actions in the event that racially derogatory conduct is found to have occurred. In so ordering, the Court was not unmindful of the due process rights of public employees, or of the defendants' obligations under the current collective bargaining agreements. The Court believes that its order is consistent with both of these considerations, because it provides for disciplinary action only after an investigation, a hearing and a finding that racially derogatory conduct took place based upon clear and convincing evidence. These procedures are intended to supplement current disciplinary procedures, not to supplant them. Defendants are, of course, encouraged to continue the training and counselling programs currently in place.

In addition, the Department of Corrections retains substantial input in the employee discipline process, by virtue of the director's ability to comment upon disciplinary actions recommended by the panel. Thus, considerations of personnel policy which might otherwise escape the attention of the panel will be brought to its attention, and the panel retains authority to modify its disciplinary order in light of those considerations.

The Court is not unaware that inmates may use the disciplinary process contemplated by its order to harass corrections officers by filing frivolous or unfounded claims of racially derogatory conduct. First, the Court has every confidence that the Ombudsman's panel established by this Order will be able to recognize such grievances, and to deal with them in the appropriate fashion. Second, the Order provides that past uncorroborated allegations of such conduct may be used only in very limited instances, and only in those instances where they would appear to be most helpful. I have attempted to resolve the tension between the due process rights of corrections officers and the obvious fact that most inmate complaints of racially derogatory conduct are ignored or go unsubstantiated by staff in two ways. First, the order provides that lack of staff corroboration will not automatically resolve the grievance in favor of staff. Second, it provides that records of all grievances be maintained and severely limits their use. Thus, if a pattern of frivolous complaints by a particular inmate develops, or if a pattern of non-frivolous, but unsubstantiated complaints against a particular staff member develops, the panel may take this into account in deciding whether to modify a disciplinary finding or in considering a grievance for which there is no staff corroboration. Third, the order attempts to deal with the problem of unsubstantiated complaints by providing a method for mediating such disputes. It is hoped that staff and inmates will be able to resolve such grievances through this mediation process, without the necessity of formal disciplinary action against either the staff member or the inmate involved. However, the panel retains final authority to order formal discipline, should the mediation process fail.

Finally, the order requires the Ombudsman's Office to maintain a record of each grievance filed alleging racially derogatory conduct, and the result of that grievance. As noted above, these records may only be used for very limited purposes. In addition, the Ombudsman's Office will use the records to prepare an annual report for the Court and the parties to review. If it appears, upon receipt of this report that the Court's plan is ineffective or unworkable,

the Court will consider modifying this aspect of its Order.

■ 4. *Access to Courts.* The most difficult aspect of this portion of the order was attempting to devise a plan which would provide the constitutionally required amount of access without exceeding the constitutional minimum. Obviously, the defendants may not be forced to provide more than minimally adequate access to the courts, and they must be allowed to choose their preferred method for providing that access, within minimal constitutional constraints. *See, Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The defendants' proposed remedial plan was deficient in several respects. The most obvious deficiencies included increased responsibilities for prison law librarians without a corresponding increase in the amount of legal training offered to those individuals, and the proposed abolishment of the "jailhouse lawyer" system. Moreover, my Opinion of August 10, 1987 identified fundamental difficulties in the inventory system currently in place within the law library system, and defendants failed to propose a reasonable alternative to the current system. Finally, the defendants' plan for providing paralegal assistance to certain prisoners provided no assurance that prisoner communications with these paralegals would be considered confidential, and the requirement that prisoners execute a waiver of liability before such services would be provided to them would unacceptably undermine inmate confidence in the system. In addition, the defendants' plan creates an unacceptable degree of conflict of interest, in that the paralegals are employed and supervised by the very department they are paid to sue. The defendants' plan would also delay paralegal services provided to prisoners in segregation, with no provision for providing earlier assistance to those prisoners facing court-imposed deadlines.

■ Plaintiffs' original plan also contained certain deficiencies. First, plaintiffs requested that the Court constrain the defendants' ability to transfer prisoner paralegals to other institutions for nondisciplinary reasons. The Court declined to accept this recommendation for several reasons. First, I believe that it unacceptably intrudes on the discretion of prison administrators to control prison populations and to maintain discipline within the institutions. *See, Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Prisoner transfers may be necessary for any number of reasons, and the need to transfer a particular prisoner need not always relate to that prisoner's misconduct. Thus, I believe it is essential to maintain the defendants' discretion to transfer any prisoner for nonarbitrary or nonretaliatory reasons of sound corrections management. Second, while it is certainly possible that defendants will use this power to weaken the legal access program established by this order, by transferring trained prisoner paralegals to other institutions for retaliatory reasons, I do not assume that the defendants will act in that fashion. Until it becomes apparent that the defendants have abused their discretion, I am unwilling to usurp their role as administrators.

■ Plaintiffs also suggested that the department's authority to search the legal access program's offices be curtailed. The defendants presented credible evidence that such a requirement would unacceptably intrude on their ability to maintain internal discipline and order. On the other hand, it is necessary to provide prisoners with some assurance that their confidential legal communications will in fact remain confidential. Thus, the order provides that the legal access program designate one staff member who is available at all times and within two hours of any departmental request to supervise a search or "shakedown" of the program's offices. This program staff member will be allowed to observe departmental searches of the program's offices, but the order does not incorporate plaintiffs' suggestion that only one departmental employee be allowed to search prisoner files at any one time. I believe that this compromise adequately takes into account prisoners' privacy interests in their legal papers, while allowing

the department to conduct extensive searches of the program's offices on short notice.

■ The order attempts to resolve the difficulties inherent in providing only the minimum amount of legal access constitutionally required by allowing the program's board of directors to adopt bylaws defining both the services which will be provided by the program and the types of prisoners to whom those services will be available. While this solution introduces a degree of uncertainty into the order, I believe that it represents a "healthy sense of realism" about the difficulties of administering any legal access program in a prison context. The board will know, better than the Court, which services are necessary and which inmates need those services, given the constitutional requirements and the inevitably limited resources the program will receive. It seems far more efficient to allow the individuals who provide those services to draw up regulations concerning their availability, than to have a Court, which stands far removed from the realities of prison life, allocate those services. The order requires that the board adopt bylaws which will provide only the constitutionally required minimum amount of service. The department will have adequate representation on the board to insure that it performs this function adequately, and that it is aware of departmental budgetary constraints when it draws up the bylaws. Finally, the order requires that the board submit its bylaws to the Court for review. Should the board adopt over-zealous bylaws, the Court will be able to curtail that enthusiasm and ensure that defendants are required to do no more than that which is constitutionally required.

■ The order further requires the defendants to provide both paralegal assistance and law libraries to prisoners. Defendants' proposed order incorporated the same mix of services, and thus the Court does not believe that this aspect of the order requires defendants to provide more than minimally adequate services. *See, Penland v. Warrent County Jail,* 759 F.2d 524, 531–32 (6th Cir.1985); *Hooks v. Wain-wright,* 775 F.2d 1433, 1437–38 (11th Cir. 1985). Moreover, as I noted in my earlier opinion, the defendants failed to demonstrate at trial that the library system provided adequate access to illiterate prisoners, to prisoners who do not speak English or to prisoners who lacked the skills necessary to use the library materials available. Provision of paralegal assistance to at least those prisoners is constitutionally required. *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498.

The only other provision of the order which merits comment is the provision which allows defendants to abolish the mini law library system in exchange for providing greater paralegal assistance to prisoners in segregation units. Those units are currently provided legal access through the use of mini law libraries and through a call-out system which allows prisoners to obtain books from the main law library. The order contemplates that defendants would abolish the mini law libraries, but leave the call-out system in tact, while providing all segregation prisoners with paralegal assistance.

■ I decided to provide defendants with this option because, after attempting to supervise the mini law library system in *United States v. Michigan,* No. G84–63, I have concluded that it is an unworkable solution to the problem of providing legal access to prisoners in segregation units. There have been chronic problems with maintaining the proper collection inside the mini law libraries and with preventing the mutilation of the remaining volumes. Even assuming the collections are maintained in a constitutionally adequate condition, I have no confidence that the majority of segregation prisoners possess the skills required to make adequate use of that collection. Further, there are very real security problems associated with maintaining the mini law libraries. The present system places a great burden on corrections officers in segregation units because it requires that prisoners be moved from their cells to the law library cell. The degree of prisoner movement involved increases security risks to guards and takes away from

the time they have to perform their other duties.

■ On the other hand, I cannot conclude that the mini law libraries do not provide constitutionally adequate access to the courts, assuming that the complete collection is maintained. The defendants have discretion to provide access to the courts through the use of law libraries. They are not required to provide legal assistance to prisoners if they provide adequate opportunities for "self-help" programs. *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498, *Penland,* 759 F.2d at 531; *Holt v. Pitts,* 702 F.2d 639, 640–41 (6th Cir.1983). It seems to me, however, that a realistic evaluation of the mini law library system can lead only to the conclusion that it is more trouble than it is worth. While it does provide minimal access it also poses constant problems both in maintaining the adequate collection and in maintaining proper discipline and order within the segregation units. As I have said, these shortcomings do not render the system constitutionally inadequate, they only indicate that it is inefficient. Thus, I believe it would be improper, and inconsistent with my previous rulings, to require defendants to abolish the mini law libraries. I have, therefore, decided to give them the option of abolishing that system, in exchange for their commitment to provide increased paralegal assistance to prisoners in segregation, including those prisoners who would otherwise be ineligible to receive those services. Obviously this would require modification of the consent decree currently in place in *United States v. Michigan,* and the Court would be disposed to grant a motion to that effect. In addition, defendants may have an obligation arising in *Hadix v. Johnson* to maintain the mini law library system. This Court, of course, has no control over that litigation and can give no assurance that the court or the plaintiffs involved in that case would agree to the system proposed in this order. I can only indicate that I think it would be a more efficient and more reasonable alternative for providing the constitutionally required access to the courts than the system currently in place.

## CONCLUSION

This order represents at least a partial culmination of four years of litigation on numerous complex issues of constitutional law. The Court is confident that its order represents a fair and workable solution to the constitutional inadequacies noted in its previous opinion, and that it adequately balances the constitutional rights of prisoners against the very real difficulties of prison administration encountered by the defendants. After such long and arduous litigation, an order which did not accomplish these goals would constitute a miscarriage of justice for the prisoners involved, for the defendants and for the public. For this reason, the Court retains continuing jurisdiction over this matter to monitor the implementation of its order, and remains open to the possibility that certain aspects of its order will require modification in light of the complex and intractable problems encountered by both prisoners and prison administrators.

## ORDER

### I. TOILETS AT RIVERSIDE CORRECTIONAL FACILITY

A. The defendants shall complete the installation of in-room toilet facilities in the administrative and reception units at the Riverside Correctional Facility (RCF) within twenty-six (26) months of the date of this Order.

B. Within sixty (60) days of the date of this Order, the defendants shall submit to the Court a plan for the construction of in-room toilet facilities at RCF. The plan shall identify the various stages necessary to complete the construction of these facilities (bidding, funding, planning, construction, etc.) and the expected completion date for each step.

C. Defendants shall submit quarterly reports to the Court and the parties indicating the progress of each stage of this project. Defendants shall submit such a report each quarter until the construction of the toilet facilities is completed.

D. The defendants shall promptly inform the Court and the parties of any anticipated delays in the completion of this project and the reason(s) for such delays.

E. Within thirty (30) days of the date of this Order, the defendants shall submit a plan for monitoring inmate access to sanitary toilet facilities at RCF during the interim between this Order and completion of this project. The defendants shall identify the monitor (who shall not be an employee of the Department of Corrections) and his or her duties. Those duties shall include regular inspections of interim facilities available at RCF, interviews with staff and inmates, the availability of clean urinals, cleaning supplies, and inmate release to use sanitary facilities. The monitor shall submit quarterly reports to the Court and the parties each quarter until construction of toilet facilities is complete.

## II. LEGAL MAIL

A. Defendants shall revise their policy on the handling of legal mail to indicate that all mail received from any civilian attorney or paralegal, from a court or from the Legislative Corrections Ombudsman shall be opened only in the presence of the prisoner, if the prisoner submits a written request for such handling. The policy for handling legal mail shall be uniform at each institution involved in the instant litigation.

B. Once a prisoner has submitted a request in writing to have his legal mail opened in his presence, the request shall be indicated on the CMIS computer to alert all institutions to which the prisoner might transfer that his or her legal mail requires special handling. Defendants shall revise their policy on the handling of legal mail to insure that all institutions are aware of and use this code.

C. Each prisoner who is received by the Department of Corrections at any of its Reception and Guidance Centers will be given written notice of this policy and asked if he wishes to have legal mail receive special handling. The defendants shall ensure that prisoners who are unable to read this written notice shall receive equivalent notice of the legal mail policy. If the prisoner wishes to have his legal mail receive special handling, a notification to that effect shall promptly be placed on the CMIS computer. If the prisoner does not request special handling, the prisoner shall be informed that he may receive special handling at any time by submitting a written request to the mailroom supervisor at the institution where he is incarcerated.

D. Defendants shall submit, within thirty (30) days of the date of this Order, a plan to notify all current prisoners, on a one time basis, of the changes in the legal mail policy, and to place any requests of current prisoners to have their legal mail receive special handling on the CMIS computer.

E. Defendants shall submit, within thirty (30) days of the date of this Order, their proposed revision of the legal mail policy.

F. This Order shall become final upon the Court's approval of defendant's revised policy.

## III. RACIAL SLURS

A. All prisoner grievances concerning racially derogatory conduct by staff shall be forwarded by the Director of Michigan Department of Corrections ("MDOC" or "the department") to the Legislative Ombudsman's Office for investigation. The Ombudsman's Office shall appoint a three person panel to investigate each grievance. The panel shall submit findings and recommendations to the Director of the department ("the Director") within thirty (30) days of receipt of the grievance.

1. In investigating the grievance, the panel may take any steps necessary to develop the relevant information concerning whether racially derogatory conduct by staff took place. This should include the taking of statements from all persons in the area at the time the conduct allegedly occurred. Lack of staff corroboration shall not automatically resolve the grievance in favor of staff. The panel shall not recommend disciplinary action unless it finds, by clear and convincing evidence, that the racially derogatory conduct took place.

2. The staff member alleged to have engaged in racially derogatory conduct and the inmate(s) submitting the grievance shall have an opportunity to appear before the panel to present a defense, to explain the charges made and to respond to any information developed by the panel. Inmates in segregation may be required to submit their comments in written form if security or logistical considerations prevent them from appearing before the panel in person.

3. Before making its final recommendation, the panel may require the staff member(s) and inmate(s) involved to meet in an effort to mediate the dispute. The parties may resolve the grievance in any manner which is agreeable to all parties and to the panel, including, but not limited to the following:

a. Less severe sanctions for staff conduct than those provided by this Order;

b. In any case where a prisoner has been subject to disciplinary action and alleges that the circumstances of the offense included some form of racial harassment, the panel and parties may agree to recommend to the Hearing Officer or the Administrative Segregation Committee that any punishment received by the prisoner be modified pursuant to paragraph IIIC of this Order. The Hearing Officer and the Administrative Segregation Committee shall accept this recommendation unless clear and convincing evidence indicates to the contrary.

c. The parties may agree to expunge the grievance from the Ombudsman's Office's records or from staff and prisoner records which would otherwise indicate that such a grievance had been filed or its result.

4. If the panel finds that racially derogatory conduct took place, the panel shall recommend the following disciplinary action, and shall inform the staff member, the grievant and the Director of its final recommendation and the reasons for this recommendation in writing:

a. In the case of any staff member who has less than two years seniority:

(i) first offense: formal counselling and a written reprimand to be placed in the staff member's personnel file;

(ii) second offense in two years: two days suspension without pay;

(iii) third offense in two years: three days suspension without pay;

(iv) fourth offense in two years: five days suspension without pay;

(v) fifth offense in two years: discharge;

b. In the case of any staff member who has two years or more seniority:

(i) first offense: two days suspension without pay;

(ii) second offense in two years: three days suspension without pay;

(iii) third offense in two years: five days suspension without pay;

(iv) fourth offense in two years: discharge.

5. If the panel finds that the racially derogatory conduct did not take place, that the evidence does not support disciplinary action against the staff member, or that disciplinary action may not be taken against the staff member for other reasons, the panel shall advise the staff member, the grievant and the Director of that result and the reasons for the panel's decision in writing.

B. The Director, or his designated representative, shall review the panel's findings and recommendation and shall, within ten (10) days of its receipt, inform the panel, the staff member and the grievant of the Director's decision to accept or reject the panel's recommendation.

1. If the Director takes no action within ten (10) days after receipt of the panel's finding and recommendation, the panel's finding and recommendation shall become final;

2. If the Director agrees with the panel's finding and recommendation, the panel's decision shall become final;

3. If the Director disagrees with the panel's decision, he shall inform all parties concerned of his reasons for rejecting the panel's decision and shall, within ten (10) days, meet with the panel to attempt to

resolve the disagreement. If the Director and the panel are unable to come to a mutually agreeable resolution of the grievance, the panel's decision shall become final. If the Director and the panel are able to agree upon a modified decision, they shall inform all parties of the modification in writing and that modified finding and recommendation shall become final.

C. Disciplinary Proceedings Against Inmates:

1. If an inmate charged with a disciplinary offense alleges that the circumstances of the offense included some form of racially derogatory conduct by staff, this claim shall be referred to the panel established by the Ombudsman's Office. The panel shall investigate the claim in the manner described in paragraph IIIA(1) of this Order.

2. If the panel finds that racially derogatory conduct took place, the Hearing Officer in charge of the underlying disciplinary proceedings shall hold a rehearing to determine whether any remaining punishment should be modified. The report of the rehearing shall include the finding of racially derogatory conduct. In any case where disciplinary action against an inmate resulted in the assignment of the inmate to administrative segregation, and the placement was based in whole or in part on the incident involving racially derogatory conduct, the Administrative Segregation Committee shall review the decision to assign the inmate to administrative segregation and consider whether that assignment should be modified.

D. The Ombudsman's Office, or the panel, shall create and maintain a system of records to monitor the incidence of inmate grievances concerning racially derogatory conduct by staff members and the resolution of such grievances.

1. The records referred to above shall include, at a minimum:

a. Each such grievance filed, and each claim referred to the panel pursuant to paragraph IIIC of this Order;

b. The name(s) of the inmate(s) filing the grievance or claim and the staff member(s) against whom the grievance or claim was filed;

c. The result of such grievances or claims, including any disciplinary action taken or any other findings made by the panel;

d. Whether the Director agreed or disagreed with the panel's findings and recommendation and any modification of that decision made pursuant to paragraph III(B)(3) of this Order;

e. Whether the grievance was resolved through paragraph III(A)(3) of this Order and the agreement reached by the parties (including whether the Hearing Officer or Administrative Segregation Committee adopted the panel's recommendation to reduce or modify disciplinary action taken against a prisoner);

f. Whether disciplinary action taken against a prisoner was modified pursuant to paragraph III(A)(3)(b) of this Order.

2. The panel may consider whether a staff member has had previous grievances filed against him or her which alleged racially derogatory conduct but which were not the subject of disciplinary action against the staff member, and/or whether the inmate filing the grievance has filed such grievances in the past which were not the subject of disciplinary action against a staff member only in the following circumstances:

a. In considering whether to modify its final findings and recommendations at the request of the Director pursuant to paragraph III(B) of this Order;

b. In considering a grievance for which there is no staff corroboration.

3. The Ombudsman's Office shall, on an annual basis, submit to the Court and the parties a report indicating the number of such grievances and claims filed, their outcome and any recommendations the Ombudsman's Office has for modifying the procedures created by this Order. The parties shall submit their written responses to this report, if any, within thirty (30) days of its receipt. The Court will then entertain arguments for the modification of this portion of its Order.

## IV. ACCESS TO COURTS

A. Legal Access Program

1. The MDOC shall contract with a non-profit corporation that will provide paralegal services in the subject institutions to assist prisoners in making collateral attacks upon their convictions and in challenging the conditions of their confinement.

a. The MDOC may choose to contract with an existing non-profit legal services corporation, such as Prison Legal Services at SPSM, provided that the authority and staff of such corporation are expanded consistent with the requirements of this Order.

b. The MDOC shall award the contract referred to in this paragraph within ninety (90) days of the date of this Order, unless it shows cause why, acting with all deliberate speed, the contract cannot be awarded within that time period.

2. Board of Directors:

a. Composition: The Board of Directors of this corporation shall consist of seven members, selected as follows (unless the MDOC decides to contract with an already existing program which has a board of directors or its equivalent):

(i) three members selected by defendants;

(ii) three members selected by the plaintiffs;

(iii) one member selected by a vote of the appointed members who shall serve as chair.

b. Term: The members of the Board of Directors shall serve two-year terms, without compensation.

c. The Board of Directors shall hire and supervise the Legal Program Director pursuant to paragraph IV(A)(3) of this Order.

d. Bylaws: The Board of Directors shall develop bylaws for the operation of the legal access program which bylaws shall be submitted to the Court for approval within ninety (90) days of the Board's appointment. The bylaws shall, at a minimum, address the following issues:

(i) Standards for determining which prisoners are entitled to receive the services of the program. These standards should, at a minimum, provide the following services;

(A) general research assistance to any prisoner using a law library;

(B) assistance in drafting pleadings, responding to motions or to reports and recommendations for inmates who are illiterate, who do not speak English or who are otherwise unable to translate their complaints into an organized presentation;

(C) the standards shall be designed to insure that the program provides only the minimum amount of service constitutionally required.

(ii) Duties of civilian paralegals hired pursuant to paragraph IV(A)(4)(a) of this Order, which shall include:

(A) periodic visits to segregation units, protective custody units and other areas of the institutions where inmates do not have direct access to a main law library;

(B) the frequency with which these visits must be made;

(C) prompt response to written prisoner requests for paralegal assistance;

(D) conducting inventories of main and mini law libraries and submitting orders for replacement or duplicate copies of library materials;

(E) regular "desk hours" in law libraries to provide general research assistance to prisoners using the libraries, including the times such assistance will be available, and the portion of the paralegal's work hours devoted to such assistance;

(F) regular "office hours" to discuss particular cases with clients unable to use the library; including how such visits will be scheduled and supervised and the portion of the paralegal's work hours devoted to such assistance;

(G) scheduling of law library time for general population prisoners (call-outs), including scheduling time for meetings between "jailhouse lawyers" and other prisoners and between prisoner paralegals and other prisoners;

(H) delivery of materials from the main law library to prisoners who would not

otherwise have access to the main law library.

(iii) Duties of prisoner paralegals, hired pursuant to paragraph IV(A)(4)(b) of this Order, to include:

(A) regular "desk hours" at law libraries to provide general research assistance to prisoners;

(B) provision of research and drafting assistance to civilian paralegals;

(C) rules governing confidential conferences between prisoner paralegals and other prisoners, if any such conferences are to be allowed, and how those conferences should be scheduled and supervised.

(iv) Standards for denying program assistance, other than general research assistance to prisoners, and alternatives to be made available to prisoner if program assistance is denied. These standards should address the issues of:

(A) assaultive prisoners;

(B) prisoners who wish to proceed with frivolous complaints and/or prisoners who are excessively litigious;

(C) categories of cases the program shall not provide assistance for (e.g., cases for which equivalent services are already available).

e. Shakedowns and other security issues: The Board shall provide a means by which at least one civilian staff person is "on call" at all times (available 24 hours a day and within two hours of any department request) for the purpose of facilitating shakedowns pursuant to paragraph IV(A)(5)(d) of this Order. The Board shall insure that the appropriate departmental staff at each subject institution are aware at all times of the identity and location of the staff person designated pursuant to this paragraph.

f. Annual Report: The Board shall prepare an annual report to be submitted to the Court and the parties. This report shall include annual case statistics, prisoner utilization data, a review of library inventories and replacement of materials or provision of duplicate materials, a review of staffing levels required pursuant to paragraph IV(A)(4)(a) and (b) of this Order

and any recommendations the Board may have for the modification of any provision of this Order.

3. Program Director: The Board shall hire one program director who shall be an attorney licensed to practice in the State of Michigan. The Board shall conduct an annual performance evaluation of the Director.

a. The Director's salary and benefits shall be competitive with the salary and benefits provided to other attorneys employed by the State of Michigan.

b. The Director shall have the following duties:

(i) Hiring, training and supervision of civilian and prisoner paralegals at each institution;

(ii) Development of the training curricula for civilian and prisoner paralegals which shall include both substantive and procedural matters;

(iii) Processing of prisoner grievances regarding the law library, library collection and paralegals. All such grievances shall be made directly to the program director as a Step III grievance;

(iv) Approval of "jailhouse lawyer" contracts pursuant to the standards currently specified in PD–DWA–61.01 and Rule 791.-6617.

(v) The presentation of an annual report to the Board which shall include:

(A) performance evaluations of civilian and prisoner paralegals;

(B) annual case statistics, prisoner utilization data and recommendations for changes in staffing requirements.

4. Staffing Requirements: In addition to the Program Director, the following staff shall be provided at each institution:

a. Civilian Paralegals: Each institution shall have full-time civilian paralegals, who shall possess at least a two-year paralegal degree, as follows:

MBP: One for general population and trustee
One for segregation and protective custody
MR: One for general population and trustee

One for segregation and protective custody

SPSM North: One

SPSM South: One

b. Prisoner Paralegals:

(i) Each institution shall hire paid prisoner paralegals as follows:

MBP: 4

MB–Trustee: 2

MR: 5

MR–Trustee: 1

SPSM North: 3

SPSM South: 3

(ii) This position shall be a paid prison job assignment with wages comparable to those in Industries.

(iii) The department shall retain the right to transfer prisoner paralegals for disciplinary and other reasons consistent with sound corrections management. The department shall, however, insure that prisoner paralegals are not transferred for arbitrary or retaliatory reasons.

(iv) Prisoner paralegals shall be hired by the program director upon recommendation of the civilian paralegal and shall not be restricted by the prison job classification requirements. In the hiring process, the program director and civilian paralegal shall consider the candidate's skill, interests and length of sentence. When prisoners have equal skills and interest, the civilian paralegal shall recommend the prisoner with the longest sentence.

c. Inmate Law Clerks: Defendants shall either retain the inmate law clerks with their current duties and training or provide a corresponding increase in the number of prisoner paralegals hired and transfer duties currently given to law clerks to the prisoner paralegals.

5. Physical Requirements

a. Sufficient office space will be provided for all civilian paralegals at or near the main law libraries with suitable privacy to conduct interviews with prisoner clients.

b. Hours of operation shall not be limited by the hours of operation of the law library.

c. Existing equipment and supplies shall be available to the program and shall include the following at each main law library office:

(i) photocopy machine;

(ii) electric typewriters;

(iii) telephone lines with access to both institutional and outside lines (provided, however, that prisoner paralegals shall not be allowed access to outside telephone lines).

d. All shakedowns of the areas in which the employees of the corporation work shall be done in the presence of the civilian paralegal or other civilian employee of the program designated pursuant to paragraph IV(A)(2)(d)(v) of this Order. Shakedowns shall be conducted in such a manner that Department employees do not read the legal materials and that the civilian paralegal or other employee is able to observe each Department employee as the search is carried out. Department employees shall conduct the search in such a manner as to assure only searches for contraband and not the reading of client files.

B. Libraries

1. The defendants shall supplement the required minimum collection at each main law library with at least one copy of the following materials:

a. A complete set of Wright and Miller, *Federal Practice and Procedure;*

b. Michigan Civil Jury Instructions

c. Local state court rules and the local rules for the Western and Eastern Districts of Michigan and for the Sixth Circuit;

2. The defendants shall supplement the required minimum collection at the main law library at Marquette Branch Prison with the materials noted in paragraph IV(B)(1) of this Order, and with a recent treatise on Habeas Corpus and Post–Conviction Remedies.

3. Defendants shall maintain the mini law libraries at each of the subject institutions and shall supplement the collection at each mini law library with the following materials:

a. Current PDs and OPs;

b. State Administrative Rules regarding the MDOC;

c. Pencils, writing and carbon paper, kite and grievance forms, and forms to request books from the main law library collection;

d. Posted instructions on obtaining assistance from the civilian paralegal and obtaining books from the main law library collection;

e. At least two chairs and suitable surface space for interviews with the civilian paralegals.

4. As an alternative to the maintenance of the mini law libraries pursuant to paragraphs IV(A)(6) and IV(B) of this Order, the defendants may choose to abolish the mini law libraries and to provide, instead, increased paralegal assistance to prisoners in segregation units. If the defendants adopt the latter alternative, defendants shall provide appropriate increases in the civilian and prisoner paralegal staff pursuant to paragraph IV(A)(4) of this Order and shall authorize the legal access program to provide all necessary legal services to all prisoners in segregation units. This will include all general research assistance as well as assistance in drafting pleadings and other legal documents. Defendants shall insure that paralegal assistance is provided to segregation prisoners who might not otherwise require such assistance, in order to replace the previously available self-help assistance provided by the mini law libraries. Nothing in this paragraph shall be construed to alter segregation prisoners' current level of access to materials from the main law libraries on a call-out basis. Defendants shall inform the Court and the plaintiffs of their decision, as between these alternatives, within ninety (90) days of the date of this Order.

5. Defendants shall assure that prisoners at the Michigan Reformatory Trustee Division have access to the courts through either of the following means:

a. Establishment of a main law library with the required minimum collection and the supplements ordered in paragraphs IV(B)(1) and IV(B)(2) of this Order plus general research assistance and advice for prisoners who require it from a civilian or prisoner paralegal; or

b. Establishment of a mini law library pursuant to paragraph IV(B)(3) of this Order with access to the services of a civilian paralegal and to books from a main law library without the necessity of requesting a temporary transfer to another institution.

c. Defendants shall inform the Court and the plaintiffs of their decision, as between these alternatives, within ninety (90) days of the date of this Order.

6. Library Time:

a. Time in the mini law library shall not be restricted.

b. Time in main law libraries will be as follows:

(i) General population: Six (6) hours weekly, with additional time as needed and approved by the civilian paralegal;

(ii) Jailhouse Lawyers: No restriction for those prisoners providing legal assistance to other prisoners pursuant to defendant's policy directive PD–DWA–61.01 and Rule 791.6617.

c. Time spent in conference with the prisoner or civilian paralegals shall not be counted as law library time.

7. Inventories:

a. Defendants shall insure that each subject institution uses a standardized form to inventory main and mini law library collections. The current SPSM form is acceptable.

b. The civilian paralegal shall conduct inventories of the main and mini law libraries at least semi-annually. Prisoner paralegals shall conduct inventories of the main law library collections for quarters during which the civilian paralegal does not conduct an inventory.

c. The semi-annual inventories conducted by civilian paralegals shall be submitted to the Program Director for review and to the librarian at each institution.

d. The civilian paralegal shall post the most recent inventories of the main and mini law library collections in each mini law library.

e. The Program Director shall submit to defendants a plan for standardizing the replacement of law library materials and

for providing duplicate copies of those materials when needed. The plan shall create a standard for determining when a duplicate copy must be ordered and shall identify the individual(s) responsible for ordering duplicate and replacement materials.

## V. CONTINUING JURISDICTION

The Court shall exercise continuing jurisdiction over this matter to monitor defendants' compliance with this Order.

## VI. FINAL ORDER

Notwithstanding any obligation to submit plans to this Court, the defendants are directed to act with all deliberate speed to immediately implement the various requirements of this Order. This Order is intended to become final and appealable within ninety (90) days of the date of this Order, or upon a submission by defendants indicating their choice between the alternatives noted in paragraphs IV(B)(4) and IV(B)(5) of this Order, whichever occurs first.