Gary KNOP, et al., Plaintiffs–Appellees, Cross–Appellants,

v.

Perry M. JOHNSON, et al., Defendants–Appellants, Cross–Appellees.

Everett HADIX, et al., Plaintiffs–Appellees,

v.

Perry M. JOHNSON, Individually and as Director of the Michigan Department of Corrections, Defendant–Appellant.

Nos. 88–1563, 88–1634 and 88–1879.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1992.

Decided Oct. 16, 1992.

998

Patricia A. Streeter, Detroit, Mich., William L. Fette, American Civ. Liberties Fund of Michigan, Kalamazoo, Mich., Elizabeth R. Alexander (argued and briefed), Chief, Staff Counsel, Washington, D.C., for plaintiffs-appellees Gary Knop, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, Jon Spytma, Robert Shipp, Butch Davis, Ron Mixon and Kerwin Cook.

Susan Przekop Shaw, Barbara A. Schmidt, Office of Atty. Gen., Corrections Div., Thomas C. Nelson (argued and briefed), Atty. Gen., Office of Atty. Gen., Habeas Div., Lansing, Mich., for defendants-appellants Perry Johnson, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik and Jack Bergman.

Larry Bennett, Lopatin, Miller, Freedman, Bluestone, Erlich & Rosen, Michael Barnhart (argued), Barnhart & Mirer, Patricia A. Streeter (briefed), Detroit, Mich., Thomas M. Loeb, Southfield, Mich., for plaintiffs-appellees Everett Hadix, Richard Mapes, Patrick C. Sommerville, Rossevelt Hudson, Jr., Brent E. Koster, Lee A. McDonald, Darryl Sturges, Robert Flemster, William Lovett, James Covington, Frank Thomas and James Hadix.

Susan A. Harris (argued and briefed), Asst. Atty. Gen., Office of Atty. Gen. of Mich., Detroit, Mich., Susan Przekop Shaw, Office of Atty. Gen., Corrections Div., Lansing, Mich., for defendant-appellant Perry Johnson and defendants Barry Mintzes, individually and as Warden, Charles Anderson, individually and as Past Warden, William F. Grant, individually and as Deputy Warden, Daniel Trudell, individually and as Deputy Warden, Duane Sholes, individually and as Deputy Warden, John Jabe, individually and as Business Manager of State of Mich., James Pogats, individually

and as Administrative Asst. to the Warden, Roy Rider, individually and as Classification Director of State Prison, Charles Ustess, individually and as Resident Services Director of State Prison, Don P. Leduc, individually and as Chairman of Corrections Com'n, Robert Brown, Jr., Deputy Director, Graham Allen, Elton Scott, Pam Withrow, Frank E. Elo, Marjorie Van Ochten and John Prelesnik.

Arthur J. Tarnow, Detroit, Mich., Sandra Girard (argued and briefed), Prison Legal Services of Michigan, Inc., Jackson, Mich., for amicus curiae Prison Legal Services of Michigan, Inc.

Before: NELSON and BOGGS, Circuit Judges, and WILHOIT, District Judge.*

DAVID A. NELSON, Circuit Judge.

These are consolidated appeals in two class actions brought against the Director of the Michigan Department of Corrections by inmates of the Michigan prison system who challenge the constitutionality of certain conditions of their confinement. Both cases involve the State Prison of Southern Michigan at Jackson, and *Knop* involves three other Michigan prisons as well.

An issue common to the appeals in both *Knop* and *Hadix* is whether the district courts erred in finding, as both did, that Michigan prisoners have been denied their right of access to the courts. On the records before us, and finding no clear error in the facts as determined by the district courts (Enslen and Feikens, JJ.) in their thorough and well-crafted opinions, we are satisfied that there are at least some Michigan prisoners who have been denied the type of access to the courts required under current Supreme Court doctrine.

Although it is well established that the federal constitution requires states affirmatively to assist state prisoners in obtaining access to the courts for presentation of constitutional claims related to their confinement, see *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977),

there has been some uncertainty as to the breadth of the class of claims covered by this requirement and as to how far the states must go in affirmatively facilitating the prisoners' access to the courts. Our recent decision in *John L. v. Adams*, 969 F.2d 228 (6th Cir.1992), which involved incarcerated juveniles, teaches that affirmative assistance need not be provided for litigation that is not related to the inmate's incarceration. The same limiting principle applies, we believe, with respect to adult prisoners. The principle was correctly applied in *Knop*, but not in *Hadix;* the remedial order in the latter case should have been limited, as was the order in *Knop*, to assistance for prisoners in making collateral attacks on their convictions and in challenging the constitutionality of the conditions of their confinement.

■ Meaningful access to the courts cannot be assured for juveniles, as both sides agreed in *John L.*, absent access to an attorney. For adult prisoners, however, access to the courts need not entail access to an attorney; access to an adequate law library, or to paralegal personnel with access to such a library, is sufficient. The *Hadix* court directed the Department of Corrections to provide both a constitutionally sufficient law library and a staff of attorneys; in this, as in certain other respects, we conclude that the court abused its discretion.

The *Knop* court did not require that a staff of attorneys be maintained, but it ordered the Department to procure paralegal services by contract with a non-profit corporation. The court rejected a plan under which paralegal assistance would have been provided directly by the Department. Here too, we believe, the remedy went too far; both cases must be remanded for the development of less intrusive remedies. In the interest of insuring uniformity in the reshaping of the remedies, we shall remand both cases to a single court.

The appeal in the *Hadix* case is limited to the access to courts issue, but *Knop* pres-

* The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

ents several other issues as well. Except as indicated below, we shall affirm the judgment of the district court as to each of the remaining issues presented in *Knop*.

## I

The plaintiff class that was certified in *Knop* consists of prisoners at the State Prison of Southern Michigan at Jackson,[1] the Marquette Branch Prison, the Michigan Reformatory at Ionia, and the Riverside Correctional Facility, also located in Ionia. *Knop v. Johnson*, 667 F.Supp. 467, 469 (W.D.Mich.1987). With the exception of the prisoners at Riverside and the Central Complex at Jackson, the *Knop* class evidently corresponds to that certified in *Walker v. Johnson*, 544 F.Supp. 345 (E.D.Mich.1982), *aff'd in part and rev'd in part sub nom. Walker v. Mintzes*, 771 F.2d 920 (6th Cir.1985).

One of the claims advanced in *Walker* was that the Michigan authorities had "violated plaintiffs' equal protection clause right to meaningful access to the courts as established in the Supreme Court case of *Bounds v. Smith*." 544 F.Supp. at 361. The district court acknowledged in *Walker* that Michigan's prison law library facilities were adequate, but found that a cutback in library hours following a series of prison riots had unlawfully restricted access to the libraries. *Id.* The district court ordered that library hours be increased.

On appeal, this court observed that there had been no showing that any prisoner had actually been denied access to the courts or had actually been prejudiced in a lawsuit. 771 F.2d at 932. We reversed the order in which the district court had specified hours of operation for prison libraries, and we directed the court to consider, on remand,

"whether adequate access to court has been denied any prisoner." *Id.*

Although the *Walker* case was remanded to the Eastern District of Michigan, access to courts was one of the issues litigated in a 35-day bench trial conducted by Judge Enslen, of the Western District of Michigan, in *Knop*. The parties did not inform Judge Enslen that the access to courts issue had.been remanded to another court, and it was only in preparing his opinion that he focused on this. See 667 F.Supp. at 484–85.[2] Acknowledging that "[i]t may be regrettable that there have been two federal court proceedings involving the same issue and the same class of inmates," Judge Enslen concluded that it was simply too late in the game for him not to decide the plaintiffs' access to courts claim. *Id.* at 485. We have no quarrel with this conclusion.

Judge Enslen discussed the merits of the plaintiffs' access claim at pages 486 through 496. After describing the library system in detail and identifying its perceived defects, Judge Enslen found that although some inmates were able to use the system to prepare effective complaints, a greater number (particularly inmates confined in segregation, the illiterate, and inmates with intellectual handicaps) were unable to use the system to gain meaningful access to judicial forums. Such access, as the court correctly noted, entails not only the drafting of complaints and petitions for relief but also the drafting of responses to motions to dismiss and the drafting of objections to magistrates' reports and recommendations.

After the submission of proposed remedial plans and comments thereon, Judge En-

---

**1.** The Jackson facility contains several "complexes," one of which—the Central Complex, housing about 2,400 prisoners—is the subject of the order in *Hadix*. Central Complex prisoners have been excluded from the *Knop* class as far as the access to courts issue is concerned.

**2.** In an opinion filed 18 months earlier in connection with a motion for partial dismissal on *res judicata* grounds, however, the *Knop* court did say that it had examined *Walker* carefully, and it did note that the Sixth Circuit had remanded the case "for the district court to con-

sider whether adequate access to court has been denied any prisoner." Slip Op. of 3/20/86, docket item 466, at p. 7, quoting *Walker*, 771 F.2d at 932. Given the extraordinary amount of written material connected with this litigation, and given the fact that none of the litigants questioned the appropriateness of the Western District as a forum for litigation over the access to courts issue, we do not find it surprising that the district court should have failed to raise this question at the outset on its own motion.

slen conducted further hearings in March of 1988. He subsequently issued a final opinion and order, reported as *Knop v. Johnson*, 685 F.Supp. 636 (W.D.Mich.1988), directing the Michigan Department of Corrections to contract with a non-profit corporation for providing paralegal assistance to prisoners; requiring the hiring of an attorney to function as a program director; and establishing staffing requirements that included specified numbers of civilians with two-year paralegal degrees, prisoner paralegals, and/or inmate law clerks. The order further provided that the corporation's board of directors, only a minority of whom were to be chosen by the Department, should develop standards for providing general research assistance to any prisoner using a law library, plus drafting assistance to illiterate prisoners and those unable to express themselves in English. Portions of the order were stayed by this court pending appeal.

Shortly after entry of the remedial order in *Knop*, an opinion and order were filed in *Hadix*. See *Hadix v. Johnson*, 694 F.Supp. 259 (E.D.Mich.1988) (Feikens, J.). A class consisting of all prisoners confined in Jackson's Central Complex had been certified in *Hadix* some years earlier. Most of the issues raised in the case were settled under a comprehensive consent decree entered early in 1985. Section VI of the consent decree, captioned "Access To Courts," contained detailed provisions on how much time various categories of prisoners should be permitted to spend in prison libraries, what books should be included in the libraries, how prisoners facing court deadlines could get additional library time, and related matters. (A copy of Section VI, with its "Appendix B," is set forth as an appendix to this opinion.) Two questions relating to court access were not settled in the consent decree, however, and the decree provided for the submission of these questions to the court for resolution after a hearing on the merits. The decree framed the questions thus:

"(1) Whether and to what extent Defendants are constitutionally required to provide attorneys to assist prisoners with legal matters.
(2) If attorneys must be provided, whether and to what extent these attorneys must be independent."

The opinion and order issued by Judge Feikens in 1988 broadened the issue as follows:

"whether, and to what extent, the defendants are constitutionally required to provide access to the courts for inmates in the Central Complex through the provision of additional attorneys, paralegals (civilian or inmate), and other means to assist inmates with civil actions (including habeas corpus proceedings) and related matters (i.e., grievances)." 694 F.Supp. at 262–63.

In 1979 Judge Feikens had remarked on "the existence of experienced writ writers at [Jackson] and other institutions who are able to frame an inmate's complaint in constitutional terms well enough for presentation to a state or federal court." *Glover v. Johnson*, 478 F.Supp. 1075, 1097 (E.D.Mich.1979). By 1988, however Judge Feikens had become persuaded, as had Judge Enslen, that the pool of competent inmate writ-writers, or "jailhouse lawyers," was not adequate to meet constitutional norms.[3]

Judge Feikens concluded that the Department of Corrections was constitutionally required to establish a program of legal assistance for Central Complex inmates substantially more comprehensive than the program ordered in *Knop* for inmates housed elsewhere. Under the *Hadix* order, for example, requests for legal assistance were to be entertained not only in connection with the drafting of habeas corpus petitions and civil rights claims (including, but not limited to, those challenging conditions of confinement) but also in connection with "[o]ther civil claims involving matters such as domestic relations, personal injury, deportation, workers' compensation, social

---

**3.** The Department of Corrections has also had its problems with jailhouse lawyers. In the proceedings held before Judge Enslen with respect to a remedy, the Department proposed abolition of the jailhouse lawyer system altogether. See 685 F.Supp. at 641.

security, detainer, wills and estates, and taxation." 694 F.Supp. at 295. The *Hadix* court further found that representation should be provided "in civil matters where an inmate (1) is a defendant; (2) did not initiate the action; and (3) where an inmate's rights will expire absent timely initiation of suit...." *Id.* at 294. To provide non-judicial relief for prisoners with administrative concerns, moreover, the *Hadix* court ordered the Department of Corrections to adopt an elaborate grievance program conforming to criteria spelled out by the court. *Id.* at 296–98. And to provide the legal representation thought to be necessary for Central Complex prisoners, the Department of Corrections was ordered to enter into a five-year renewable contract with Prison Legal Services of Michigan, Inc. That entity, under the court's order, was to maintain staffing levels consisting, at a minimum, of a program director, four staff attorneys, six certified paralegals, and necessary auxiliary staff. *Id.* at 295.

The Director of the Department of Corrections has appealed from the orders in both *Hadix* and *Knop.* The *Knop* plaintiffs have appealed from the denial of certain racial discrimination claims.

## II

In Part A of this section we discuss the constitutional underpinnings and scope of the right to affirmative assistance in obtaining access to courts. In Part B we discuss the types of legal matters to which the state's duty of providing affirmative assistance extends.

### A

*Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), represents the Supreme Court's most far reaching description of the "right of access" first recognized in *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).[4] The Court's opinion in *Bounds* is silent as to the source of this right, but on other occasions the Supreme Court has said variously that it is founded in the Due Process Clause of the Fourteenth Amendment, *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), or the Equal Protection Clause, *Pennsylvania v. Finley,* 481 U.S. 551, 557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 7, 109 S.Ct. 2765, 2768, 106 L.Ed.2d 1 and see *id.* at 11 n. 6, 109 S.Ct. at 2771 n. 6 (1989) (plurality opinion of Rehnquist, C.J.), or the First Amendment right to petition for a redress of grievances, *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (citing *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)); *Hudson v. Palmer,* 468 U.S. 517, 523, 104

---

4. In *Hull,* a prisoner—who was incarcerated at Jackson, as it happens—had repeatedly tried to send a petition for habeas corpus, supported by exhibits, to the Clerk of the United States Supreme Court. Michigan prison officials kept confiscating these materials, but with help from his father the prisoner finally succeeded in getting them to the Court. To justify the institution's attempts to prevent the prisoner from filing his papers, the prison warden cited a regulation requiring all petitions to be reviewed and approved by state officials before they could be filed. The Supreme Court held the regulation invalid:

> "The considerations that prompted its formulation are not without merit, but the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." 312 U.S. at 549, 61 S.Ct. at 642.

The prohibition against abridging or impairing a prisoner's right to apply for habeas corpus relief subsequently spawned a requirement for affirmatively aiding and abetting such applications. The seminal case is *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), a two-sentence per curiam opinion affirming the decision of a three-judge district court in *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal. 1970) (California Department of Corrections ordered either to expand its prison libraries or "devis[e] another system whereby indigent prisoners are given adequate means of obtaining the legal expertise necessary to obtain judicial consideration of alleged grievances cognizable by the courts." *Id.* at 112). The only authority that the Supreme Court cited on the merits in *Younger v. Gilmore* was *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), which held simply that in the absence of alternative legal resources a state may not constitutionally prohibit prison inmates from assisting other inmates in the preparation of petitions for post-conviction relief.

S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (same). Lower courts have also implicated the Privileges and Immunities Clause of Article IV. *Nordgren v. Milliken,* 762 F.2d 851, 853 (10th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985); *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir.1990). See generally *John L. v. Adams,* 969 F.2d 228, 231–32 (6th Cir. 1992).

One Court of Appeals has suggested, with respect to principles developed under the "right of access" rubric, that "because their textual footing in the Constitution is not clear, these principles suffer for lack of internal definition and prove far easier to state than to apply." *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985). Judge Enslen, similarly, has spoken of the "vagueness" of the decision in *Bounds. Knop,* 667 F.Supp. at 493. But while the constitutional underpinnings of today's right of access doctrine may be thought to lack intellectual coherence, we believe that the parameters of the doctrine are relatively clear.

The Supreme Court did not hold, in *Bounds,* that prison authorities are constitutionally required to provide attorneys-at-law to assist prisoners in the preparation of habeas corpus petitions and the like. The *Bounds* inmates asserted, before the district court, that a library facility plan proposed by North Carolina prison officials as a means of assuring access to the courts

could not pass constitutional muster unless supplemented by a legal defenders' program under which prisoners could receive the assistance of independent attorneys. See *Smith v. Bounds,* 538 F.2d 541, 542 (4th Cir.1975). The district court *refused* to require the state to establish an independent attorneys' office, and this decision was affirmed by the Court of Appeals for the Fourth Circuit: "the District Court correctly ruled that the State is under no constitutional duty to offer the inmates of its penal institutions both adequate legal research facilities and an independent attorneys' office, however helpful the dual service might be." *Id.* at 544 (footnote omitted). The Supreme Court likewise affirmed, holding that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted, emphasis supplied). As the Eleventh Circuit has observed, "it is noteworthy that *Bounds* refers to law libraries *or* other forms of legal assistance, in the disjunctive, no fewer than five times." *Hooks v. Wainwright,* 775 F.2d 1433, 1435 (11th Cir.1985), *cert. denied,* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986).[5]

---

5. Our own court, like other courts of appeals, has always understood the Supreme Court to have meant what it said in holding that prisoners must be provided adequate law libraries "or" adequate assistance from persons with legal training. In *Holt v. Pitts,* 702 F.2d 639, 640 (6th Cir.1983), we explicitly endorsed "the proposition that a prisoner's constitutionally-guaranteed right of access to the courts has been protected when a state provides that prisoner with *either* the legal tools necessary to defend himself, *e.g.,* a state-provided law library, *or* the assistance of legally-trained personnel." (Emphasis supplied.) We went on to observe, in *Pitts,* that

"The alternative avenues open to state authorities to protect a prisoner's right of access to the courts are precisely that—alternatives. The choice between alternatives lies with the state." *Id.*

*Cf. Penland v. Warren County Jail,* 759 F.2d 524, 531 n. 7 (6th Cir.1985) (*en banc*) ("Prisoners

may not dictate to the state the method by which access to the courts will be assured."). Accord, *Cepulonis v. Fair,* 732 F.2d 1, 6 (1st Cir.1984) ("*Bounds* requires only 'adequate law libraries *or* adequate assistance from persons trained in the law,' not both"); *Ward v. Kort,* 762 F.2d 856, 860 (10th Cir.1985) ("Under *Bounds,* the State is free to make a choice...."); *Hooks v. Wainwright,* 775 F.2d 1433, 1435 (11th Cir.1985), *cert. denied,* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986) (reversing a district court holding that "no plan contemplating libraries alone could be sufficient due to inmate illiteracy;" the *Bounds* Court necessarily contemplated reliance on inmate writ-writers or nonlawyer law clerks, see *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)); *Kelsey v. Minnesota,* 622 F.2d 956, 958 (8th Cir. 1980) ("government need not provide inmates with *every* possible means of access to the courts").

**1004**

Although the *Bounds* Court noted that many states provide some degree of professional or quasi-professional legal assistance to prisoners under programs that "may have a number of advantages over libraries alone," 430 U.S. at 830–31, 97 S.Ct. at 1499, the Court specifically stated that "a legal access program need not include any particular element" of this kind. *Id.* at 832, 97 S.Ct. at 1500. Inmates must be assured access to courts that is "adequate, effective, and meaningful," *id.* at 822, 97 S.Ct. at 1495, but the touchstone is access to *courts*, not access to lawyers.

As the Supreme Court held in *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), prisoners have no constitutional right to be represented by state-paid counsel when mounting collateral attacks upon their convictions. Even where inmates on death row are concerned (and there are no such inmates in Michigan, that state having no death penalty), *Bounds* teaches that "[t]he requirement of meaningful access can be satisfied in various ways," and "state legislatures and prison administrators must be given 'wide discretion' to select appropriate solutions." *Murray v. Giarratano*, 492 U.S. 1, 14, 109 S.Ct. 2765, 2773, 106 L.Ed.2d 1 (1989) (concurring opinion of Kennedy, J., quoting *Bounds*, 430 U.S. at 833, 97 S.Ct. at 1500).

The prison library plan that was approved in *Bounds* contemplated the establishment of approximately seven core libraries to serve a prison population of about 10,000 people. 538 F.2d at 542–43. It was stipulated that "each library [would] make use of one or two inmates as typists to prepare court petitions and ... supervise the day-to-day use of the library. * * * Those inmates who work in the libraries ... [would] be trained to the best extent possible in researching legal questions and assisting inmates in their research. They [would] also be permitted to help illiterate and semi-literate inmates." *Id.* at 543, n. 1. If North Carolina had implemented this plan, the *Bounds* litigation would presumably have been at an end.

North Carolina did not properly implement the plan, as it turned out. Almost a decade after the plan was approved as satisfying the state's constitutional obligation, the state still had no workable program for training inmate paralegals to assist other prisoners in the use of the libraries. See *Harrington v. Holshouser*, 741 F.2d 66, 69 (4th Cir.1984). Notwithstanding the inadequacy of the state's efforts in this area— described by the Court of Appeals as "a chronology of failure," *id.*—the court initially rejected the thesis that "the only way that the State constitutionally can afford library access to its inmates is by employing the services of a legal services plan...." *Id.* at 70.

On remand, after the state had repeatedly failed to respond to orders directing it to show that it was in compliance with its plan, the district court finally concluded that the only way to ensure that inmates received meaningful access to the courts would be to require the assistance of licensed counsel. *Smith v. Bounds*, 610 F.Supp. 597, 605–06 (E.D.N.C.1985). The plan adopted by the district court provided for ten attorneys (one for every 1,000 prisoners), who were to be made available under a contract with Legal Services of North Carolina, Inc. *Smith v. Bounds*, 657 F.Supp. 1327 (E.D.N.C.1986).

A Fourth Circuit panel affirmed the district court's decision. It was uncontested, the panel said, that, among other things, "the state had not demonstrated [even af-

Where female prisoners lack their male counterparts' history of "self-help" in the law, however, equal protection considerations may require that library facilities be supplemented by assistance from a lawyer. *Canterino v. Wilson*, 546 F.Supp. 174, 216 (W.D.Ky.1982), *aff'd.* No. 86–6067, 1989 WL 40131, 1989 U.S.App. LEXIS 4789 (6th Cir. April 10, 1989) [875 F.2d 862 (table) ] (unpublished), *cert. denied*, 493 U.S. 991, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989). *Cf. Smith v. Bounds*, 538 F.2d 541, 545 (4th Cir. 1975) (women prisoners may not be afforded less access to legal research facilities than male prisoners). See also *Glover v. Johnson*, 478 F.Supp. 1075, 1094–97, 1103 (E.D.Mich.1979) (the fact that a women's prison library was much smaller than the men's library at Jackson did not constitute illegal discrimination, but the state was ordered to continue offering the assistance of Prison Legal Services because the women had no experienced inmate writ-writers and lacked any history of self-help in the legal field).

ter the passage of ten years] that it had provided for the training and placement of *any* inmate paralegals." *Smith v. Bounds*, 813 F.2d 1299, 1302 (4th Cir.1987) (emphasis supplied). The panel went on to make the following observations:

> "The district court did not conclude, as the defendants contend, that prisoners have a constitutional right to access to an attorney. The district court ordered a remedy of attorney assistance because the state's program of law libraries had failed to meet the defendants' constitutional obligation of providing meaningful access to the courts." *Id.*

The panel opinion was approved by the court en banc in a brief per curiam opinion that stressed the defendants' long history of failing to respond to the district court's orders and concluded that the record showed "North Carolina was unable or unwilling to implement its library plan consistent with minimum constitutional requirements." *Smith v. Bounds*, 841 F.2d 77, 78 (4th Cir.) (*en banc*), *cert. denied*, 488 U.S. 869, 109 S.Ct. 176, 102 L.Ed.2d 146 (1988).

▮ The Director of the Michigan Department of Corrections has not engaged in the sort of contumacious conduct attributed to the North Carolina authorities in the *Bounds* litigation. Absent such conduct, we see no justification for the federal courts to require the authorities in Michigan to use taxpayer dollars to hire attorneys-at-law for the preparation of prisoner lawsuits.[6]

It may well be a good idea for Michigan to provide lawyers for prisoners who want to bring lawsuits of their own. Federal judges, however, should be ever mindful of the obvious fact that not all good ideas are mandated by the Constitution. *Hooks v.*

*Wainwright*, 775 F.2d 1433, 1438 (11th Cir. 1985), *cert. denied*, 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). As Justice O'Connor succinctly put it in her concurring opinion in *Murray v. Giarratano*, 492 U.S. 1, 13, 109 S.Ct. 2765, 2772, 106 L.Ed.2d 1 (1989), "[b]eyond the requirements of *Bounds*, the matter is one of *legislative* choice based on difficult policy considerations and the allocation of scarce legal resources." (Emphasis supplied.)[7]

In our constitutional democracy, as we understand it, *legislative* choices are to be made by legislators who are subject to removal by the people, and not by judges who enjoy office for life. See *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 31, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973) (courts lack both authority and competence to assume a legislative role); *cf. Kelley v. Metropolitan Co. Bd. of Educ.*, 836 F.2d 986, 996 (6th Cir.1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988). A " 'mother knows best' approach should play no part in traditional constitutional adjudication." *Murray v. Giarratano*, 492 U.S. 1, 11, 109 S.Ct. 2765, 2771, 106 L.Ed.2d 1 (1989) (plurality opinion of Rehnquist, C.J.).[8]

But the conclusion that Michigan need not provide attorneys to prepare prisoner lawsuits does not end our inquiry. Standing alone, law libraries that are adequate for prisoners who know how to use them and who have reasonable physical access to their collections are not adequate for prisoners who cannot read and write English, or who lack the intelligence necessary to prepare coherent pleadings, or who, because of protracted confinement in administrative or punitive segregation or protec-

---

**6.** In many cases, it should be remembered, the taxpayers will already have paid for attorneys to represent the prisoners in their criminal trials and in their direct appeals. Approximately 20 attorneys on the staff of the State Appellate Defenders Office, for example, represent indigent Michigan prisoners in appeals as of right. *Hadix*, 694 F.Supp. at 275. That kind of legal aid is, of course, a horse of a different color; we are concerned here with civil actions in which the prisoner is the plaintiff, not criminal actions in which the prisoner is the defendant.

**7.** "Prison administration is, moreover, a task that has been committed to the responsibility of [the legislative and executive branches of government], and separation of powers concerns counsel a policy of judicial restraint." *Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).

**8.** For a somewhat different view, see Feikens, "Federal Courts are Governing Society Today: Should They?" 1991 Det.L.Rev. 1363.

tive custody, may not be able to identify the books they need.

Under the library plan that was considered by the Supreme Court in *Bounds,* as we have seen, the libraries would not have stood alone; it was contemplated that trained inmates would be made available for helping the illiterate and semi-literate, for performing or helping in the performance of legal research, and for typing court petitions. It does not appear that comparable assistance has been provided, to the extent required, in the Michigan prisons. Judge Enslen found, for example, that librarians at Jackson's North and South Complexes were not competent to perform legal research; that inmates hired there as law clerks were not allowed to assist other inmates in their legal research; and that "the often-fabled jailhouse lawyers or writ-writers are, at least in the Michigan system, too few and often too uninformed to provide adequate assistance to the inmates." *Knop,* 667 F.Supp. at 488. As far as Jackson's Central Complex is concerned, similarly, Judge Feikens found that neither the librarians nor the inmate library clerks were sources of legal assistance; that the assistance available from jailhouse lawyers and inmate paralegals was "unreliable" and "restricted by financial, security, and other constraints;" and that outside attorneys were not available with any certainty, particularly for the substantial percentage of inmates (between 20% and 50%) who are unable to explain their grievances in writing. *Hadix,* 694 F.Supp. at 284–85.[9] The records contain evidence of a number of specific instances where unassisted inmates suffered individualized harm because of inability to use library resources properly.

We do not disagree with the conclusion, reached by both of the district courts, that something more was required in the way of paralegal assistance. It is fundamental that a prisoner who claims to be confined unconstitutionally must be allowed to state his case to a court. Some such prisoners, given law books and simplified pleading forms of the sort furnished by the courts, can handle the task adequately themselves. Others, for reasons fully explained in the opinions of both district courts, cannot. For prisoners of the latter sort, as a practical matter, there can be no meaningful access to the judicial system unless some literate person is available to reduce their stories to intelligible written pleadings.

To the extent that inmate writ-writers, or jailhouse lawyers, are not adequately filling the needs of prisoners who claim they are being held unconstitutionally, the state must furnish, at a minimum, the functional equivalent of jailhouse lawyers who are up to the job. This means paralegals— not necessarily individuals who have completed two-year training courses designed for document-managers at large corporate law firms, but intelligent laypeople who can write coherent English and who have had some modicum of exposure to legal research and to the rudiments of prisoner-rights law. "Although legal training need not be extensive, *Bounds* does require that inmates be provided the legal assistance of persons with at least some training in the law." *Gluth v. Kangas,* 951 F.2d 1504, 1511 (9th Cir.1991) (citations omitted).

The order of the district court in *Hadix* contemplates that Prison Legal Services will "represent" inmates in a variety of civil matters. The court's verb choice is significant, and it reflects, we think, a misunderstanding of what the Supreme Court has said the Constitution requires. Inmates who have signified a desire to go to court to present civil rights claims or claims for post-conviction relief are not *ipso facto* entitled to legal *representation.* They are entitled, rather, to "access"— which means getting the courthouse door

9. Inmates who are reasonably articulate, on the other hand, and who have legitimate constitutional claims cognizable under 42 U.S.C. § 1983, are often able to retain outside counsel. The bar is not unaware that 42 U.S.C. § 1988 authorizes the award of reasonable attorney fees to plaintiffs who prevail in § 1983 actions, and such awards are sometimes substantial. See, for example, *Roland v. Johnson,* No. 91–1460, 1992 WL 214441, 1992 U.S.App. LEXIS 22047 (6th Cir., September 4, 1992) [974 F.2d 1339 (table) ] (unpublished), where the lawyers for a Michigan prisoner who prevailed in a § 1983 action are receiving a fee of almost $150,000.

opened in such a way that it will not automatically be slammed shut on them. Once access has been attained, whether through a complaint that is entirely homemade or through one prepared by or with the help of a writ-writer or paralegal, the court can decide whether the case presented is one that calls for the appointment of a lawyer to represent the plaintiff.

Under 28 U.S.C. § 1915(d), the court may request an attorney to represent any indigent prisoner litigant—but "[a]ppointment of counsel pursuant to 28 U.S.C. § 1915(d) is not appropriate when a *pro se* litigant's claims are frivolous ... or when the chances of success are extremely slim." *Childs v. Pellegrin,* 822 F.2d 1382, 1384 (6th Cir.1987), quoting *Mars v. Hanberry,* 752 F.2d 254, 256 (6th Cir.1985). If the court does not choose to see that the litigant receives legal representation, the state obviously has no independent duty to provide such representation. And the state, as Judge Enslen correctly noted, "is not obligated to do anything more than assist inmates at the pleading stage." *Knop,* 667 F.Supp. at 494. The required assistance, as we have seen, falls considerably short of legal "representation."

■ Although the *Knop* court acknowledged that "a district court must impose the least intrusive remedy available," 685 F.Supp. at 637 (internal quotes omitted), and must allow the defendants to choose their preferred method of providing at least minimally adequate access to the courts, *id.* at 641, we believe that the final order in *Knop* was more intrusive than necessary. The defendants submitted a plan for providing assistance for certain prisoners through paralegals employed and supervised by the state. The court rejected this approach because (1) it failed to assure that prisoner-paralegal communications would receive the kind of confidentiality that attaches to lawyer-client communications, (2) it required prisoners to waive any right to sue the paralegals for malpractice, and (3) it created an unacceptable degree of conflict of interest, the paralegals not being independent of the state. *Id.* In place of the state's plan, the court ordered

the Department of Corrections to obtain paralegal services from a non-profit corporation controlled by a board of directors on which both the prisoners and the department would have representation. *Id.* at 647. The program of legal services furnished by the corporation was to be operated under detailed bylaws developed by the board and approved by the court. *Id.* Other than appointing a minority of the corporation's board of directors and paying all the bills, the state was evidently to have little to do in seeing to the provision of paralegal assistance.

It is far from self-evident that access to courts cannot be assured without having paralegals hired by a legal services corporation that has been created to insulate the paralegals from supervision, direct or indirect, by those whom the electorate have chosen to govern. We note that under the laws of the Commonwealth of Virginia, for example, "unit attorneys" are appointed directly by the state government to serve as legal advisors, or "talking lawbooks," for inmates wishing to bring incarceration-related litigation. See *Murray v. Giarratano,* 492 U.S. 1, 5, 109 S.Ct. 2765, 2767, 106 L.Ed.2d 1 (1989); *cf. Giarratano v. Murray,* 668 F.Supp. 511, 514 (E.D.Va.1986). Even as to prisoners on death row, five of the current justices of the United States Supreme Court concluded, in *Giarratano,* that Virginia's scheme does not violate the Constitution. And the dissenting opinion of Justice Stevens, joined by the remaining three justices (two of whom are no longer members of the Court), did not assert that the Virginia plan would be constitutionally inadequate for prisoners who have not been sentenced to death.

*Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), is also instructive in this connection. Because Tennessee provided no meaningful alternative for prisoners who wished to seek post-conviction relief, the United States Supreme Court held that Tennessee could not impose a blanket prohibition against inmates setting themselves up as writ-writers for other inmates. "Jails and penitentiaries," said the Court, "include among their inmates a high percentage of persons who are totally

**1008**

or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited." *Id.* at 487, 89 S.Ct. at 750. Such persons are not automatically entitled to appointed counsel when they indicate they wish to seek post-conviction relief, the Court declared, which is why the state must at least let them consult with prisoner writ-writers—and must do so notwithstanding that such writ-writers "are sometimes a menace to prison discipline and that their petitions are often so unskillful as to be a burden on the courts which receive them." *Id.* at 488, 89 S.Ct. at 750.

The *Johnson* Court noted with apparent approval that "[a]t least one State employs senior law students to interview and advise inmates," while other states have public defenders, paid from public funds, available to consult with prisoners on habeas corpus matters. *Id.* at 489, 89 S.Ct. at 750. Without expressing any judgment concerning such plans, the Court noted that they demonstrate the availability of "techniques ... to provide alternatives if the State elects to prohibit mutual assistance among inmates." *Id.* at 489–90, 89 S.Ct. at 751.

Neither a system involving the direct employment of legal personnel by a state nor a system of mutual assistance among inmates could guarantee avoidance of the type of potential conflict of interest by which the *Knop* court was troubled. Neither system, similarly, could assure a prisoner whom the system had failed that he would have a reasonable chance of obtaining a collectable judgment for malpractice. And where unregulated inmate writ-writers are concerned, at least, it seems doubtful that the confidentiality of inmate communications could be assured. Such considerations simply did not seem to trouble the *Johnson* court—one reason, in all probability, being that the Court obviously did not think of writ-writers as providing legal representation.

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), finally, the Supreme Court declared that illiterate inmates involved in prison disciplinary proceedings "should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the *staff* or from a sufficiently competent inmate designated by the *staff.*" *Id.* at 570, 94 S.Ct. at 2982 (emphasis supplied). Here again, the Supreme Court seems to have been far less concerned than was the *Knop* court about reliance on assistance provided by employees of the state.

■ Perhaps the advantages of placing all prisoner paralegals on the payroll of a non-profit corporation would outweigh the disadvantages of doing so. We do not believe, however, that the courts may appropriately tell the Department of Corrections how to strike this balance. "Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation." *Toussaint v. McCarthy,* 801 F.2d 1080, 1086 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). Fundamental precepts of comity and federalism admit of no other rule—and such precepts "are perhaps nowhere more compelling than in actions seeking relief against unconstitutional practices ... in state penal institutions." *Kendrick v. Bland,* 740 F.2d 432, 437 (6th Cir.1984), citing, among other cases, *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14, 69 L.Ed.2d 59 (1981); and *Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). See also *Turner v. Safley,* 482 U.S. 78, 88–89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989); and *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 753, 116 L.Ed.2d 867 (1992). If the State of Michigan wishes to facilitate its prisoners' access to the courts by furnishing assistance through paralegals hired and supervised by the state itself, we think it should be permitted to do so.

**B**

■ We turn next to the question of the types of legal matters to which the state's

obligation of affirmative assistance extends. The *Knop* order requires only that the prisoners be furnished paralegal assistance for making collateral attacks upon their convictions and for challenging the conditions of their confinement; the *Hadix* order, as we have seen, requires legal assistance for a variety of additional purposes, including the handling of a broad spectrum of civil matters in which inmates have been named as defendants, as well as matters in which an inmate must commence suit in a timely manner or suffer his claim to be barred by laches or a statute of limitations.

Other courts of appeals have declined to extend the *Bounds* rule beyond assistance in initiating habeas corpus proceedings (the type of lawsuit addressed in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718) and civil rights actions involving constitutional claims (a form of action which the Supreme Court has held cannot reasonably be distinguished from the habeas action. *Wolff v. McDonnell*, 418 U.S. 539, 577–80, 94 S.Ct. 2963, 2985–86, 41 L.Ed.2d 935 (1974)). See, *e.g., Nordgren v. Milliken*, 762 F.2d 851, 855 (10th Cir.), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985); *Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir.1985) (*semble*). Our own court, similarly, has read *Bounds* as requiring affirmative assistance for incarcerated juveniles only in "the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration." *John L. v. Adams*, 969 F.2d 228, 235 (6th Cir. 1992). As to other types of civil actions, although "states may not erect barriers that impede the right of access of incarcerated persons," we held that a requirement of affirmative assistance would be "an unwarranted extension of the right of access." *Id.* at 235–36. If such a requirement is unwarranted for incarcerated juveniles, it is unwarranted for incarcerated adults.

It might be a good idea for the taxpayers of Michigan to provide legal assistance for prisoners in all civil matters as to which a need can be demonstrated, just as it might be a good idea for the taxpayers to provide such assistance for the populace at large. Again, however, we return to the obvious truth that not every good idea is mandated by the Constitution. And if the ordinary law-abiding Michigander has no constitutional right of access to the public purse for legal assistance on claims involving such things as domestic relations, personal injury, deportation, workers compensation, social security, detainer, wills and estates, and taxation, it does not seem to us that such a constitutional right springs into existence by virtue of the needy person's having been convicted of a crime and sentenced to prison.

### III

In the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. §§ 1997 *et seq.*, Congress provided for the granting of continuances in prisoner civil rights actions "in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available." 42 U.S.C. § 1997e(a)(1). In this connection, Congress directed the United States Attorney General to "promulgate minimum standards for the development and implementation of a plain, speedy and effective system for the resolution of [state prisoners'] grievances...." 42 U.S.C. § 1997e(b)(1). Such grievance resolution systems as may be "voluntarily submitted" by individual states are to be reviewed by the Attorney General and may be certified by him as being in compliance with the minimum standards. 42 U.S.C. § 1997e(c)(1). The failure of a state to adopt an administrative grievance procedure meeting the prescribed standards cannot constitute the basis of an action by the Attorney General, however, notwithstanding the Attorney General's power, under § 1997a, to sue states that are believed to be depriving prisoners of their civil rights. 42 U.S.C. § 1997e(d).

Although adoption of a prisoner grievance system designed to meet federal standards is not mandatory under the act passed by Congress, it has been made mandatory for the Central Complex at Jackson under the order issued by the court in

*Hadix.* Agreeing with the findings of "two court-appointed experts ... that the current grievance program is ineffective and unresponsive to the needs of both the inmates and the Central Complex administration," 694 F.Supp. at 296, the district court ordered the Department of Corrections to draft policy directives to meet standards promulgated by the Attorney General for grievance programs. *Id.* at 297. The court went on to specify in some detail how this would be done with respect to such matters as inmate review of the grievance program, representation of the entire Central Complex inmate population in the review process, and employee participation in an advisory role. *Id.* The court further ordered that the grievance process should incorporate a series of discrete steps specified by the court; that the Department of Corrections should "implement personnel changes as recommended by Professor Wolfson [one of the court-appointed experts] in his study," including the hiring of qualified persons to serve as grievance investigators, members of grievance panels, grievance coordinators, and "other personnel as necessary for the objectives;" that certain of the newly hired persons ("grievance coordinators independent of the Department of Corrections, [hired] to oversee the work of the grievance investigators and the grievance panels") should provide yearly reports evaluating the performance of the grievance system; that persons involved in the grievance process should be provided training in investigation and mediation techniques; and that "the Department of Corrections shall commission a periodic review of the grievance system at the Central Complex by an outside body." *Id.* at 297–98. The district court felt that a restructured grievance program would reduce the workload of the courts by encouraging administrative resolution of disputes that currently wind up in court. The modifications that the Department of Corrections was directed to make in the existing grievance system were said to be "minimal but necessary." *Id.* at 298.

Desirable though many of these provisions may be, they do not strike us as "minimal." Neither do they appear to come within the ambit of the issues reserved by the consent decree for resolution by the court. And be that as it may, they certainly do not represent the least intrusive remedy that can be justified as necessary to vindicate inmates' constitutional right of access to the courts. If prisoners currently exercise their right of access to the courts on a broader scale than the courts would like, that hardly justifies judicial intervention in the state's administrative system under the guise of protecting the right of access to, of all things, the courts! "Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 762, 116 L.Ed.2d 867 (1992). This part of the *Hadix* order looks to us like judicial legislation run wild.

### IV

■ Subsequent to issuance of the order in *Hadix,* the defendant moved for a new trial on the strength of what appeared to be *ex parte* communications between the court and a key witness for the plaintiffs. The motion was denied in an order (docket item 505) wherein the court set forth the pertinent facts in considerable detail. The defendant contends on appeal that the *Hadix* court committed reversible error in failing either to recuse itself or to grant a new trial.

The communications in question followed a request that Judge Feikens made in open court during testimony presented by Sandra Girard, the Director of Prison Legal Services, Inc. The court asked Ms. Girard if she would prepare a written memorandum describing the impact on Prison Legal Services of frequent prisoner transfers necessitated by overcrowding. Ms. Girard said she would, agreeing, at the court's request, to send copies to counsel. No objection was made by the defendant.

In response to the court's request, Prison Legal Services prepared a nine-page memorandum dated March 11, 1988. Copies were sent to the court and to counsel.

A few days later Judge Feikens sent Sandra Girard a letter asking further questions. Although defense counsel initially disclaimed receipt of a copy of this letter, which is not part of the official court record, it is now conceded that copies were sent to counsel. Ms. Girard responded to the court's request by furnishing a survey and related materials describing legal services programs in other states. It is undisputed that defense counsel were provided copies.

Following his review of the new materials, Judge Feikens had his law clerk telephone Ms. Girard to ask about the availability of further background materials. Pursuant to this inquiry, Ms. Girard sent the court a letter, with a copy to counsel, offering to provide, among other things, certain questionnaires dealing with legal services programs in other states. Judge Feikens then had his law clerk telephone Ms. Girard again and request copies of the materials referred to in her letter. A third package of documents was submitted to the court in response to this request, with copies of the transmittal letter going to counsel. This led to the filing of written objections by the defendant and, ultimately, to the motion for new trial.

This court has made it clear that it is "impermissible for a trial judge to deliberately set about gathering facts outside the record." *Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444, 447 (6th Cir.1980). Moreover, "a judge may not direct his law clerk to do that which is prohibited to the judge." *Id.* *Ex parte* communications from a judge's chambers to one side in a contested lawsuit are "clearly at odds with our adversary system of justice." *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 425 (6th Cir. 1981) (Merritt, J., concurring). In view of these principles, Judge Feikens' requests for additional information should have been placed on the record, and the one-on-one telephone calls from the court's law clerk to the plaintiffs' key witness should not have been made.

In context, however, these lapses appear relatively harmless. Because Ms. Girard was consistently scrupulous about sending counsel copies of her letters—as the court doubtless expected her to be—the court was furnished nothing that counsel did not know about. Judge Feikens has expressly stated, moreover, that "[n]one of the documents included in the three packages of materials submitted by Girard in response to inquiries made by the Court formed any basis for my findings of fact or my conclusions of law in my Memorandum Opinion and Order filed July 1, 1988." Doc. entry 505. We have no reason to question this, and we find no error in the denial of the defendant's motion.

The only remaining issue raised on appeal in *Hadix* is whether the *Hadix* court erred in taking judicial notice of proofs in *Knop* without notice to the defendant. Our disposition of the appeals makes it unnecessary to address this question.

## V

The access to courts claim that was tried in *Knop* contained a sub-issue not presented in *Hadix:* the constitutionality of the prison officials' system of handling mail sent to inmates by courts and by counsel. Concluding that there were problems in this area, the court ordered implementation of a system-wide policy insuring that legal mail will be opened only in the presence of the addressee if that is the addressee's wish.

The *Knop* court also heard evidence on three additional claims: (1) that prisoners had been subjected to cruel and unusual punishment by reason of the Department's alleged failure to provide proper winter clothing; (2) that the lack of toilets and washbasins in certain locked cells constituted cruel and unusual punishment; and (3) that inmates were denied equal protection of the law by a variety of practices claimed to reflect racial discrimination.

The district court granted a measure of relief on each of these claims. Taking judicial notice of the severity of Michigan's winters, the court ordered that inmates who were required to go outside in the wintertime be provided adequate clothing,

including hats and gloves or mittens and, where appropriate, boots. The installation of in-cell flush-toilets was ordered in certain units at the Riverside facility. And with regard to racial discrimination, the Department of Corrections was ordered to forward all prisoner grievances on the subject to the Legislative Ombudsman's Office. Both sides have appealed from the district court's order on the racial discrimination question, and the defendants have appealed on the other issues.

## A

Under Michigan's established policy, privileged mail is to be opened only in the presence of the addressee prisoner if the prisoner has opted to request such treatment. During their orientation to the prison system, inmates receive a handbook that is supposed to explain the privileged mail policy, along with a variety of other matters. The policy is explained orally as well.

In practice, the policy varies from institution to institution. The handbooks used at some facilities do not explain the policy clearly or do not discuss it at all. At Jackson and Marquette, mail from any attorney is treated as privileged after an inmate notifies the mailroom that he has an attorney. At the Reformatory, only mail from attorneys specified by the inmate receives such treatment.

The district court found no constitutional infirmity in the opt-in system as such, but did find that the authorities' method of implementing the system, particularly at the Reformatory, permitted needless infringement of the inmates' right to confidentiality in their communications with counsel. The court observed that it is not uncommon for a prisoner to receive mail from a court-appointed attorney before the inmate knows the attorney's identity. The court therefore ordered implementation of a uniform policy at all facilities, with inmates being asked at intake whether they wish to invoke their privilege of being present at the opening of legal mail. Where the response is affirmative, all incoming mail from attorneys and from the courts is to be treated as privileged mail.

▉ A prisoner's right to receive mail is protected by the First Amendment. See *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Parrish v. Johnson*, 800 F.2d 600, 603 (6th Cir.1986). In criminal settings, the Sixth Amendment protects the attorney-client relationship from unwarranted intrusion. *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974). Prison officials may, of course, impose restrictions that are "reasonably related" to the prison's security needs or other "legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 87, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). Our court has said that prison officials must "put forth legitimate reasons for interfering with a prisoner's incoming mail." *Parrish*, 800 F.2d at 604.

▉ We agree with the conclusion of the district court that prisoners may not be required to designate particular attorneys in order to activate privileged treatment of their legal mail. The district court acted properly in requiring that each prisoner receive written notice of the legal mail policy upon intake and in eliminating any requirement that requests for special treatment of legal mail be renewed upon transfer from one facility to another.

## B

▉ The district court found that the defendants were failing to provide inmates with adequate winter clothing. This finding was not clearly erroneous. We cannot agree with the defendants' argument that the district court wrongly substituted its judgment for that of prison authorities. The Eighth Amendment prohibits punishment that "involve[s] the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion)). Exposure to Michigan winters without adequate clothing can obviously inflict pain. No legitimate government interest is served by withholding adequate

clothing, and the district court was justified in ordering the remedy it did.

### C

Certain cells at Riverside lack flush-toilets and wash basins with running water. Inmates in these cells use central lavatory facilities as permitted by prison officers. There are occasions when access to the central toilets is not permitted, necessitating the use of nonflushable receptacles in the inmates' cells. The court found the Riverside facilities to be generally clean, with the exception of areas where urine may have been spilled on the floor.

Access to toilets varies among four population groups at Riverside. One hundred thirty cells in the Riverside reception and guidance center lack toilets and wash basins. Inmates in the center are locked in their cells approximately 18 hours per day, being out of the cell three times a day for meals and once for recreation. Inmates receive portable urinals on their arrival, and some inmates use these to throw urine and feces into the courtyard. The court found that the defendants failed to provide inmates in the reception area with regular access to bathroom facilities, forcing them to relieve themselves in their cells. The court concluded that this was a violation of the Eighth Amendment.

Ninety-six cells in the protective custody unit lack toilets and basins. Protective custody inmates are locked in their cells each night from about 10 or 11 p.m. to 6 or 6:30 a.m. During the day they are generally out of their cells. Officers frequently let inmates out during the night to use the toilet facilities. Nonetheless, the court found that inmates faced a substantial risk of not being allowed to use the toilet facilities upon request and were frequently forced to urinate or defecate in their cells. In the court's view this was unconstitutional.

Approximately 20 inmates are housed in the administrative segregation unit. These inmates are confined to their cells except for a daily recreation period of one hour and during toilet trips. Officers make regular bathroom runs four or five times a day and make rounds every 30 minutes, at which time inmates can request to use the toilet. These requests are not always granted, however, particularly during the late night and early morning. The court found this to be unconstitutional.

■ We do not agree that it violates the Eighth Amendment to require prisoners to use nonflushable toilets on occasion. The drafters of the Eighth Amendment used them, after all, and countless millions of modern Americans have done so too. The district court "specifically f[ound] that the [Riverside Correctional Facility] and the [Riverside Psychiatric Center] generally are clean facilities, that defendants maintain clean hallways, and, with the exception of areas where urine may be spilled on the floor, that the cells are clean." 667 F.Supp. at 480 (citations omitted). The "[d]efendants established ... that correctional officers frequently let inmates out during the night to use the toilet facilities." *Id.* at 481. In light of these findings, we do not believe a constitutional violation can be shown on the basis of additional findings that inmates "do use their urinals in their cells, and on occasion even are forced to defecate in their cells," or that inmates regularly throw urine and feces into the courtyard. *Id.*

### D

The district court found that black inmates are not intentionally discriminated against on a classwide basis in terms of their placement in protective custody; that there is no intentional racial discrimination with respect to eating areas, food serving lines, or servers; and that racial disparities in job assignments do not represent a widespread or general pattern of discrimination. The court found further that although prison officials do not condone incidents of racially discriminatory punishment of inmates, they have condoned racial slurs. This form of racial harassment was found to represent a policy, practice, or custom of the Department of Corrections, and the court ordered the defendants to submit a remedial plan.

**1014**

■ Because the plan ultimately submitted was considered inadequate, the court took the (in its words) "somewhat drastic step of mandating particular disciplinary actions." *Knop*, 685 F.Supp. 636, 640. The order prescribed a detailed grievance system to be operated under the supervision of the Legislative Ombudsman's Office. Pursuant to the procedure described in *First National Bank of Salem v. Hirsch*, 535 F.2d 343 (6th Cir.1976), the court subsequently indicated that it was prepared to modify this portion of the order to reflect the fact that the court had no jurisdiction over the Ombudsman's Office. Instead of telling the Ombudsman's Office what to do, the court proposed to order the defendants to contract with that office, or with a similar independent agency, to implement the grievance and disciplinary procedure outlined in the court's order.

■ We have recognized that racial harassment by government employees can violate rights protected by the Equal Protection Clause. *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Supervisory officials, however, are not liable for harassment by their subordinates absent "a showing that the supervisor encouraged the ... misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). The defendants' failure adequately to investigate claims of racial harassment in this case did not, in our view, rise to the level of "encouragement." The detailed grievance procedure set forth in the district court's order, moreover, intrudes unnecessarily in the state's operation of its prisons. Part III of the order, set forth at 685 F.Supp. at 644–46, will therefore be vacated.

Shortly before trial, the plaintiffs altered their discrimination-in-employment claim to assert that the defendants' anti-discrimination policy was unconstitutional because it set a limit on minority employment. The district court correctly recognized that the altered claim pitted members of the class against each other, and it decertified the

class with respect to the claim. The plaintiffs do not challenge the partial decertification, but they contend that the court erred in failing to decide the individual claims of the named plaintiffs. As the defendants point out, however, the court was not asked to do so.

**VI**

The district court imposed sanctions against the defendants and their counsel under Rule 11, Fed.R.Civ.P., for the filing of four pretrial motions for summary judgment. The court determined that the motions were legally untenable and had been filed for an improper purpose. Finding that the district court did not "base[ ] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," and thus did not abuse its discretion, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990), we uphold the imposition of the sanctions.

The judgments of the district courts are AFFIRMED in part and REVERSED in part. The remedial order entered by the district court in *Hadix* is VACATED, Parts I, III and IV A of the remedial order entered by the district court in *Knop* are VACATED, and both cases are REMANDED to the United States District Court for the Western District of Michigan for further proceedings not inconsistent with this opinion.

**APPENDIX**

**SECTION VI OF CONSENT DECREE**

VI. *Access to Courts*

1. Each General Population inmate may use the law library at least six hours per week in two-hour segments. To accommodate this use, the law library shall remain open at least 55 hours per week, with at least one-third of those hours during evenings after 5:00 p.m. and weekends. The law library will remain open additional hours as staff becomes available. Prisoners who have pending court cases requiring additional law library

time in excess of the six-hour guarantee will be allowed the additional access necessary.

2. Within 30 days after the entry of the Judgment in this matter, the Department will initiate procedures to order for the main law library, to the extent not currently provided, each of the publications listed in Appendix B, "Minimum Collection for Main Law Libraries," with the addition of a complete edition of *Michigan Compiled Laws Annotated.* For each required publication, the Department shall have a subscription for revised additions, pocket parts, or advance sheets which shall be made available for prisoner use forthwith upon delivery to the institution. Periodically, at six-month intervals, Defendant shall survey each collection to identify missing or mutilated volumes. All missing or mutilated volumes, however discovered to be missing or mutilated, will be replaced or restored promptly.

3. Inmates in Administrative Segregation or Protective Custody shall be guaranteed two hours per week direct personal access to a limited law library collection as indicated in Appendix B, "Minimum Collection for Administrative Segregation Law Libraries." In addition, on three days each week, such inmates may request five volumes brought to them from the main law library collection unless the particular volumes are loaned to another inmate. These volumes shall be delivered to the inmate in segregation on the day following the day on which requests are collected. The book(s) may be collected after 24 hours.

4. Law library facilities shall be maintained with adequate ventilation and lighting with sufficient space to accommodate the reasonable needs of the inmates.

5. The allotted time per prisoner for law library use shall not include the time necessary to travel to and from the library, but will include only the amount of time actually spent in the library.

6. The detail system by which inmates in general population presently gain access to the law library shall be continued in order to assure prisoner access to the law library.

7. Special and additional library time shall be allowed on a call out system to an individual prisoner as needed, provided that he can demonstrate a bona fide need as determined by the supervisor of the law library. Such a bona fide need shall include, but not be limited to, situations such as a deadline for filing briefs, pleadings, responses to a pleading, or other such documents with a court.

8. Inmate staff working in the law library shall not have the authority to deny other prisoners access to the law library. Inmate staff shall be supervised by a professional librarian and staff clerk.

9. The Department of Corrections shall provide notarial services as necessary. Pursuant to the request of plaintiffs, the Department of Corrections shall post a notice at the prison law library indicating that in many cases declarations under penalty of perjury, in lieu of formal affidavits, are allowed.

10. The Department shall enforce its policy for treatment of privileged legal mail, including mail from Federal, State and local courts, governmental agencies, and attorneys, which provides that such mail will not be read, that upon the inmate's written demand, such mail will not be opened except in the presence of the inmate to whom the mail is addressed, and that such mail may be opened to search for contraband. The Department further shall provide that inmates shall seal all outgoing legal mail which prison officials shall then cause to be posted unopened in the U.S. mail.

11. Paralegal training will be instituted at the State Prison of Southern Michigan as a regular educational program

under the auspices of Jackson Community College.

12. Electric typewriters shall be permitted.

13. Any property limitation imposed on prisoners shall not apply to legal papers and law books except that if the quantity thereof conflicts with important institutional goals such as security or fire safety, a limitation may be sought through the administrative hearing process. The standard for imposition of a limitation shall be whether the material in question is reasonably necessary to assist the prisoner with respect to his pending litigation.

14. Each visiting attorney shall be afforded a table and chair in a space providing suitable privacy.

## APPENDIX B

### MINIMUM COLLECTION FOR MAIN LAW LIBRARIES

#### MICHIGAN MATERIALS

1. *Michigan Compiled Laws Annotated* (Vol. 1–2, 38–39, 40–41)
   *OR*
   *Michigan Statutes Annotated* (Vol. 1, 24, 24A, 25, 25A)

2. *Michigan Digest* (West) (all)
   *OR*
   *Michigan Digest* (Callaghan) (all)

3. *Michigan Supreme Court Reports* (Vol. 358 (1960) to the present plus subscription to advance sheets)

4. *Michigan Appeals Reports* (Vol. 1 to the present plus subscription to advance sheets)

5. *Shepard's Michigan Citations* (all)

6. Gillespie—*Michigan Criminal Law and Procedure* (all)

7. Honigman and Hawkins—*Michigan Court Rules Annotated* (all)

8. *Michigan Criminal Jury Instructions* (all)

9. Hensel—*Appeals in the Michigan Courts*

#### FEDERAL MATERIALS

1. *United States Code Annotated* (Constitution volumes, Titles 18, 28, 42)

2. *Supreme Court Reporter* (From Vol. 80 (1959) to the present plus subscription to advance sheets)
   *OR*
   *United States Supreme Court Reports,* Lawyers' Edition, 2nd Series (From Vol. 4 (1959) to the present plus subscription to advance sheets)

3. *Federal Reporter,* 2nd Series (From Vol. 300 (1962) to the present plus subscription to advance sheets)

4. *Federal Supplement* (From Vol. 200 (1961) to the present plus subscription to advance sheets)

5. *Federal Practice Digest,* 2d (all)

6. *Shepard's United States Citations* (all)

7. *Shepard's Federal Citations* (all)

8. Wright—*Federal Practice and Procedures* (Vols. 1, 2 and 3) (Criminal)

9. Sokol—*Federal Habeas Corpus* (latest edition)

#### GENERAL MATERIALS

1. *Corpus Juris Secundum* (22, 22A, 23, 23A, 24, 24A, 24B (Vols. covering Criminal Law))

2. Black—*Black's Law Dictionary,* Revised 4th Ed. (1968)
   *OR*
   Ballentine—*Ballentine's Law Dictionary,* 3rd Ed. (1969)

3. Cohen, M.—*Legal Research in a Nutshell* (latest edition)
   *OR*
   Elias—*Legal Research: How to Find and Understand the Law*

4. Bailey and Rothblatt—*Complete Manual of Criminal Forms,* 2nd Ed. (2 volumes)

5. Israel and LaFave—*Criminal Procedure in a Nutshell,* 2nd Ed. (1975)

6. *Criminal Law Reporter*

7. Rubin—*Law of Criminal Correction,* 2nd Ed. (1973)

8. Werner—*Manual for Prison Law Libraries* (1976)

9. Dorsen, N.—*The Rights of Prisoners* (1973)

OR

Rudovsky, D.—*The Rights of Prisoners* (1973)

OR

Palmer, J.W.—*Constitutional Rights of Prisoners* (1977)

10. LaFave, W.R.—*Principles of Criminal Law* (1978)

OR

LaFave and Scott, *Handbook in Criminal Law* (1972)

OR

Loewy, A.R.—*Criminal Law in a Nutshell*, 2nd Ed. (1972)

*Additional Volumes*

A complete edition of MCLA for SPSM Main Law Library.

MINIMUM COLLECTION FOR ADMINISTRATIVE SEGREGATION LAW LIBRARIES

1. *Michigan Compiled Laws Annotated* (Vol. 1–2, 38–39, 40–41)

OR

*Michigan Statutes Annotated* (Vol. 1, 24, 24A, 25, 25A)

2. A treatise on Michigan criminal law and procedure

3. Superseded "advance sheets" of Shepard's Citations (United States, Federal, and Michigan)

4. A treatise (e.g., Nutshell series) on prisoners' rights

5. A treatise on habeas corpus

6. A general treatise on criminal law and on criminal procedure

7. A legal dictionary

8. Federal rules of civil and criminal procedure

9. A Michigan Department of Corrections Resident Guidebook and

10. A list of the main law library holdings as periodically updated.